**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| JUSTIN WOOD,<br><br>Plaintiff,<br><br>v.<br><br>TRUSTEES OF DARTMOUTH COLLEGE<br><br>Defendant. | **Civil Action No. 1:25-cv-00304-SE**<br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**

**(Filed as a "Matter of Course" under Fed. R. Civ. P. 15)**

Plaintiff Justin Wood ("Mr. Wood") brings this Complaint (the "Complaint") against Defendant Dartmouth College ("Dartmouth") for breach of contract, defamation and related causes of action, resulting in damage to Mr. Wood's reputation and his ability to obtain employment.

**Introduction**

At every step of Justin Wood's coaching career prior to being named as the Head Coach of Dartmouth's Men's Cross Country Team on November 16, 2020, he enjoyed a high level of success. He coached numerous athletes who had won NCAA national championships and national athlete of the year honors. His teams won NJCAA National Championships, with one team even boasting six All-Americans and setting the NJCAA DIII Cross Country Championship meet record. He had been awarded numerous Coach of the Year Honors in both men's and women's cross country categories, along with a wealth of coaching honors, including the NJCAA National Coach of the Year for both men's cross country and men's indoor track and field.

As a runner himself, Mr. Wood had won four individual national championships, three relay national titles, and a men's cross country team national title. He was inducted into the NJCAA DIII

Cross Country/Track & Field Hall of Fame in 2010, while also being named to the SUNY Delhi Athletics Hall of Fame in 2016.

By all accounts, Mr. Wood was among the top track cross country coaches in the nation when Dartmouth named him as the Head Coach of Dartmouth's Men's Cross Country Team, and his impact on the program was substantial.  He led the Men's Cross Country Team to the NEICCCA Cross Country Team Championship title, their first in nine years, and that winter, the men's distance team had a historic season, too, with the distance medley relay winning the 2022 Ivy League Indoor Heptagonal Championships.

Unfortunately, at the time, Dartmouth's Track & Field and Cross Country Programs were being led by Porscha Dobson Harnden ("Ms. Harnden").  During his tenure, Mr. Wood raised a number of concerns about Ms. Harnden and his belief that she was leading those programs with a glaring disregard for the law and Ivy League and NCAA policies, along with potential admissions fraud and laxities taken with the health and safety of Dartmouth's student-athletes.

After opposing Ms. Harnden's unethical and unlawful behavior, Wood was offered a severance agreement, which after some negotiation, he signed, and this is where the matters that are the subject of this Complaint arise—as Mr. Wood has been subject to unlawful retaliation, including defamation and interference with his career, in violation of law and the separation agreement itself. Those remarks and their impact on Mr. Wood are the subject of this Complaint.

Following his departure, the Dartmouth cross-country team has not fared well, and ultimately, as of around August 2024, Ms. Harnden no longer appears on Dartmouth's website as the Director of Dartmouth Track & Field and Cross County.

### Parties

1. Plaintiff Justin Wood resides in Quechee, Vermont.

2. Defendant Trustees of Dartmouth College is located in Hanover, New Hampshire.

2

**Jurisdiction and Venue**

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred, and/or a substantial part of property that is the subject of the action is situated, in this district.

**Facts**

4.      On or about November 16, 2020, Dartmouth hired Mr. Wood to be head coach of the men's cross country team.

5.      At the time of Plaintiff Wood's hire, Ms. Harnden served as the Marjorie & Herbert Chase '30 Director of Dartmouth Track & Field and Cross Country.  Upon information and belief, Ms. Harnden held that position until August 20, 2024, when her name was removed as Director from Dartmouth's website.

6.      During his tenure, Mr. Wood raised a number of concerns about Ms. Harnden and his belief that she was leading those programs with a glaring disregard for Ivy League and NCAA policies, along with potential admissions fraud and laxities taken with the health and safety of Dartmouth's student-athletes.

7.      Mr. Wood, acting in good faith and with reasonable cause, reported and objected to practices directed and/or permitted by Ms. Harnden. This included, but not limited to, the practice of individuals other than the student athletes taking COVID-19 tests (and/or falsified testing documentation) to allow athletes who were sick and/or ineligible to practice and compete anyway.

8.      On August 19, 2022, Mr. Wood and Dartmouth entered into a Separation Agreement and General Release Agreement (the "Separation Agreement").

9.      In addition to severance benefits that would be paid to Mr. Wood, Dartmouth (also known as the "Employer") agreed as follows:

> **10.  <u>Non-Disparagement</u>.**  Employer agrees that it will not disparage or encourage or induce others to disparage Employee.  For the purposes of this Agreement, the term "disparage" includes, without limitation, without limitation, any statement, written or oral, public or private, or engage in any other actions which disparages or discredits Employee to the press and/or media, any individual or entity with whom Employee had or has a business relationship which would adversely affect in any manner his reputation.  Nothing in this paragraph shall preclude Employer from responding truthfully to a valid subpoena, a request by a governmental agency in connection with any investigation it is conducting, or as otherwise required by law…

10.    Shortly after signing the Separation Agreement, Mr. Wood moved to New Jersey.

11.    In late September 2022, Mr. Wood became aware of an opening for the position of Head Coach of Track and Field at New York University ("NYU").  Mr. Wood had been offered the Head Coach job by NYU in 2014.

12.    On October 3, 2022, Mr. Wood met with NYU's Athletic Director and Head Cross Country/Track & Field Coach and discussed expectations and the potential job, and on or about October 13, 2022, Mr. Wood submitted a formal application for the position.

13.    The application would require a reference check with Dartmouth.

14.    The Separation Agreement is crystal clear on what Dartmouth was permitted to state in response to reference requests:

> **11.  <u>Neutral Reference</u>.**  Employer will confirm, upon request to the Employer, that Employee voluntarily resigned, as well as Employee's dates of employment, salary history, and job title.

15.    Thus, in addition to Dartmouth's contractual duty not to disparage Mr. Wood, there was no question about how to respond to reference requests about him—neutrally and with confirmation of his resignation.

16.    In connection with Mr. Wood's application for employment, NYU called for verification, not a subjective evaluation.  In any event, Ms. Harnden's false statement exceeded the scope of a mere reference check.

17. On or about December 7, 2022, Mr. Wood was informed that during a background check call with Dartmouth, the individual at NYU who was managing the background check was informed that Mr. Wood had been "blacklisted." This blatant lie—not the contractually required neutral reference—was told by Ms. Harnden (or at her direction).

18. Endowed positions at Dartmouth signify heightened distinction. As the Marjorie & Herbert Chase '30 Director of Dartmouth Track & Field and Cross Country (and as Mr. Wood's former supervisor), Ms. Harnden had apparent authority to speak and act on Dartmouth's behalf.

19. As Mr. Wood's former supervisor responding to a reference check, Ms. Harnden published the defamatory statements in question within the scope of her employment.

20. By lying about Mr. Wood being "blacklisted," Ms. Harnden fabricated a fact to prevent Mr. Wood from becoming re-employed. No "blacklisting" language was included in the Separation Agreement, which defined the terms of Mr. Wood and Dartmouth's relationship going forward. Nor does the Separation Agreement contain any no-rehire provision.

21. Mr. Wood has never been blacklisted by any institution, including Dartmouth.

22. On October 28, 2022, the following appeared online, in a popular running blog:



23. The letsrun.com blog is a source of information for the running community of which Mr. Wood was a member.

24. When Mr. Wood called the manager of the letsrun.com blog regarding this false and defamatory information and requested to have it removed, the manager confirmed that he had spoken with Mr. Harnden's husband.

25. In other words, Ms. Harnden was the "grapevine" which spread this false rumor.

26. This report was false and published at Ms. Harnden's direction through her husband— her transparent effort to avoid consequences for defaming Mr. Wood.

27. The allegation he was "blacklisted" and the letsrun.com statements are disparaging within the meaning of paragraph 10 of the Separation Agreement and are both thus a breach of contract.

28. Upon information and belief, Ms. Harnden made the statements with actual malice, in response to Mr. Wood's complaints of her improper conduct, *i.e.*, her glaring disregard for Ivy League and NCAA policies, along with potential admissions fraud and laxities taken with the health and safety of Dartmouth's student-athletes.

29. As a result of the defamatory statements and breach of contract, Mr. Wood has suffered significant harm, including without limitation, the following: (1) financial losses stemming from the lost job opportunity at NYU, (2) compensatory damages resulting from the degradation of his reputation and foreseeable harm to his career, and (3) emotional distress.

30. Dartmouth was made aware of the allegations by email correspondence from Mr. Wood's counsel on November 9, 2022.

31. Upon information and belief, in or around the middle of February 2024, in response to questions about Mr. Wood's departure from Dartmouth, Dave Altman, a Co-Chair of the Friends of Dartmouth Track and Field ("Friends") stated that "It was exclusively driven by Justin.  He

resigned. He quit. I wish that weren't the case because it really impacted the kids… There are a variety of legal matters that I am not privy to and I am sure…you can appreciate…that from an employment perspective there's all kinds of privacy issues there, but it has been made abundantly clear to me and others…that the college did not terminate Justin. He voluntarily resigned, and the timing of it was a very big surprise to the coaches and to the administration. The timing couldn't have been worse…It was a pretty shitty process."

32.     Upon information and belief, Mr. Altman stated further that, "I know that there was a lot more behind the scenes that I was ever privy to for appropriate employment rationale and reasons. All I know is that his departure was a shock to the students and certainly a shock to those of us who have been involved in the organization. Having spoken now to every one of the coaches, none of them knew that it was going to happen when it did. None of them knew he was going to quit, and the rest of the coaches were beyond frustrated and upset with what he did. That to me was interesting, because it was someone they had worked with and had a good working relationship."

33.     These false statements were made verbally to third parties and painted Mr. Wood in a negative light.

34.     These statements were made at the direction and/or encouragement of Ms. Harnden. Ms. Harnden knew or should have known Friends would repeat these statements.

35.     Upon information and belief, Dartmouth provides information to Friends for donor relations and routinely uses Friends as a communication arm with alumni, donors and the community.

36.     Upon information and belief, Friends speakers like Mr. Altman routinely convey Dartmouth's official positions.

37.     Indeed, Ms. Harnden's relationship with "Friends" is a matter of public record, as are its efforts which allow Dartmouth to "recruit at the highest level":



38.    Further, Dartmouth has taken concrete, retaliatory steps to prevent Mr. Wood from securing comparable employment.  By way of example, in 2024, Dartmouth removed Mr. Wood from the roster for:  (i) the 2021 Men's Cross-Country Team (for which he was Head Coach), (ii) the 2020-2021 Men's Track & Field Team (for which he was Assistant Coach) and (iii) the 2021-2022 Men's Track & Field Team (for which he was also Assistant Coach).

39.    Dartmouth's alteration to the website makes it appear as if Mr. Wood was lying about his coaching experience during his job search and networking efforts (when in fact he was telling the truth).

40.    The website alteration constitutes an action which discredited Mr. Wood to his prospective employers and adversely impacted his reputation with them, constituting disparagement under the Separation Agreement.

41.    The website alteration specifically interfered with Mr. Wood's application process at Tufts University.  During Mr. Wood's interview with Tufts, the interviewer had the Dartmouth website printed.  This became an issue at the interview because Mr. Wood's wife (a volunteer) had a profile, but he did not.  Mr. Wood was subsequently dropped from the candidate pool.

42.    Other former employees terminated by Dartmouth are still listed in their coaching positions, including but not limited to: John Simons, Warren Fraser, Courtney Jaworski, Sean Gwi, Kendra Foley, Tim Wunderlich, and Jeff Forino.  Notably, some of these individuals resigned and

some were terminated.

43.     Dartmouth knew or should have known that removing Mr. Wood from its website was a breach of contract and could harm his reputation because it (a) gave the appearance of falsehood to Mr. Wood's representations regarding his prior employment and/or (b) gave the impression that, even if he had worked there, the end of Mr. Wood's and Dartmouth's working relationship was not amicable.

44.     Of note, removing Mr. Wood's participation (job history) from Dartmouth's website took place after Mr. Wood reached out to Dartmouth to put them on notice of Ms. Harnden's defamatory acts.

45.     Stated otherwise, in response to being notified of its breach, Dartmouth doubled down, deepening Mr. Wood's damages.

### COUNT I:  LIBEL *PER SE* AND SLANDER *PER SE*

46.     Mr. Wood incorporates by reference the above paragraphs as if set forth here in their entirety.

47.     Ms. Harnden's and others' non-judicial statements disparaging Mr. Wood were made with actual knowledge that the allegations were false, compounding the injury to Mr. Wood and his reputation.

48.     To the extent that these false allegations were published orally, *e.g.*, to the editors at letsrun.com, to the individual performing background checks for NYU, or generally to Dave Altman or others, the allegations constitute slander *per se.*  To the extent that these false allegations were published in writing, *e.g.*, in potential email communications, the allegations constitute libel *per se*.

49.     Ms. Harnden knew the statements to be false, and they were intentionally false or made with reckless disregard for the truth, were asserted with actual malice, and for her own financial gain.

50.     In making these false and defamatory allegations, particularly in response to the request for employment verification from NYU, Ms. Harnden acted within the scope of her employment and as an agent of Dartmouth.

51.     Whether the false non-judicial assertions constitute libel *per se* when made in writing or slander *per se* when made orally, both entitle Mr. Wood to reasonable damages without regard to whether he has sustained special damages.  However, Mr. Wood alleges that he has in fact suffered special damages as a result of Ms. Harnden and/or Defendant's conduct.

52.     Despite being on notice of the above facts, Dartmouth had the ability at any time to make a public statement concerning the departure of Mr. Wood confirming there was no misconduct on his part, but did not do so.  This constitutes the type of wanton, oppressive, or malicious conduct entitling Mr. Wood to enhanced compensatory damages.

## COUNT II:  BREACH OF CONTRACT

53.     Mr. Wood incorporates by reference the above paragraphs as if set forth here in their entirety.

54.     The Separation Agreement between Dartmouth (also known as the "Employer") and provides as follows:

> **10.  <u>Non-Disparagement</u>.**  Employer agrees that it will not disparage or encourage or induce others to disparage Employee.  For the purposes of this Agreement, the term "disparage" includes, without limitation, without limitation, any statement, written or oral, public or private, or engage in any other actions which disparages or discredits Employee to the press and/or media, any individual or entity with whom Employee had or has a business relationship which would adversely affect in any manner his reputation.  Nothing in this paragraph shall preclude Employer from responding truthfully to a valid subpoena, a request by a governmental agency in connection with any investigation it is conducting, or as otherwise required by law…

> **11.  <u>Neutral Reference</u>.**  Employer will confirm, upon request to the Employer, that Employee voluntarily resigned, as well as Employee's dates of employment, salary history, and job title.

55.     In the endowed position of Marjorie & Herbert Chase '30 Director of Dartmouth Track & Field and Cross Country (and as Mr. Wood's former supervisor), Ms. Harnden had apparent authority to speak and act on Dartmouth's behalf.

56.     Upon information and belief, the coach(es) who spoke with Dave Altman have apparent authority to speak on behalf of Defendant Dartmouth.

57.     The statements against Mr. Wood are disparaging within the meaning of paragraph 10 of the Separation Agreement, and thus a breach of contract.

58.     The statements against Mr. Wood do not constitute a "neutral" reference, and thus are a breach of contract.

59.     Dartmouth, with no excuse for nonperformance, by and through its Director of Track & Field and Cross Country and other coaches, breached the Separation Agreement.

60.     Upon notice of breach, Dartmouth failed and/or refused to cure the breach or mitigate the damages suffered by Mr. Wood.

61.     The Separation Agreement provides further that:

> **15. Breach.** The Parties agree that in the event of any breach or threatened breach of this Agreement or default hereunder, the injured party has the right to pursue any legal action available to enjoin the breaching party from further injurious conduct and/or to recover damages from the breaching party for such conduct.

62.     Mr. Wood is this entitled to the damages resulting from the breaches of contract, including the attorneys' fees and costs of this litigation.

63.     As a result of this breach, Mr. Wood suffered damages in the form of: (1) financial losses stemming from the lost job opportunity at NYU, (2) compensatory damages resulting from the degradation of his reputation and foreseeable harm to his career, and (3) emotional distress.

### COUNT III:  TORTIOUS INTERFERENCE IN PROSPECTIVE EMPLOYMENT RELATIONSHIP

64.     Mr. Wood incorporates by reference the above paragraphs as if set forth here in their

11

entirety.

65.    Ms. Harnden knew that Mr. Wood had an employment opportunity at NYU because she was responding to an employment verification call from NYU.

66.    Ms. Harnden acted with actual malice.

67.    With that knowledge, Ms. Harnden, and therefore Dartmouth, intentionally and improperly interfered in that prospective employment relationship by informing NYU that Mr. Wood had been "blacklisted" or providing other false and disparaging information.

68.    As a result of Dartmouth's tortious interference, Mr. Wood suffered damages in the form of: (1) financial losses stemming from lost job opportunity, (2) resulting compensatory damages, and (3) emotional distress.

## COUNT IV:  RETALIATION IN VIOLATION OF RSA 275-E:2

69.    Mr. Wood incorporates by reference the above paragraphs as if set forth here in their entirety.

70.    Mr. Wood was employed by Dartmouth when he engaged in his protected whistleblowing activity.  At all relevant times, Dartmouth was Mr. Wood's employer within the meaning of RSA 275-E.

71.    During his employment at Dartmouth, Mr. Wood, acting in good faith and with reasonable cause, reported and objected to practices directed and/or permitted by his supervisor, including but not limited to the use of fake COVID-19 test results (and/or falsified testing documentation) to allow athletes who were sick and/or ineligible to practice and compete.

72.    Mr. Wood's reports and objections concerned conduct Plaintiff reasonably believed violated applicable law and/or rules adopted under the laws of the United States and/or the State of New Hampshire, including but not limited to laws and regulations concerning public health and safety and fraud.

73.     Mr. Wood's reports and objections constituted protected activity under RSA 275-E:2.

74.     Dartmouth and/or its agents had knowledge of Mr. Wood's protected activity, including because Mr. Wood made the reports and objections to Dartmouth decisionmakers and/or within Dartmouth's reporting channels.

75.     After Mr. Wood engaged in protected activity, Dartmouth and/or its agents took adverse action against Mr. Wood and "otherwise discriminate[d]" against him within the meaning of RSA 275-E:2, including by communicating false and defamatory statements about him to at least one prospective employer and/or otherwise interfering with Plaintiff's future employment opportunities.

76.     The post-employment nature of this retaliatory conduct does not defeat liability where, as here, (a) the protected activity occurred during Mr. Wood's employment, and (b) the retaliatory act was closely associated with the employment relationship and designed to deter protected reporting.

77.     There is a causal connection between Mr. Wood's protected activity and Dartmouth's retaliatory conduct.  The retaliatory conduct was motivated, at least in substantial part, by Mr. Wood's protected reporting and objections.

78.     Mr. Wood has satisfied all administrative and/or statutory prerequisites and conditions precedent to the extent required under RSA 275-E, including making reasonable efforts to maintain or restore his rights through available internal processes.

79.     Mr. Wood has suffered, and continues to suffer, substantial injury and damage, and seeks relief including, but not limited to, lost wages and benefits, reputational injury, and reasonable attorneys' fees and costs.

## **<u>REQUEST FOR A JURY TRIAL</u>**

80.     Pursuant to Federal Rule of Civil Procedure 38, Mr. Wood respectfully requests that all issues herein properly triable by jury be so tried.

**PRAYER FOR RELIEF**

Wherefore, Mr. Wood prays for the following relief:

1.      that he be awarded reasonable damages, without regard for actual damages, on his claims for libel *per se* and slander *per se*;

2.      that he be awarded his actual compensatory damages and enhanced compensatory damages for Defendants' libel *per se* and slander *per se*;

3.      that he be awarded all other damages in the form of: (1) financial losses stemming from the lost job opportunity at NYU and Tufts, (2) compensatory damages resulting from the degradation of Plaintiff's reputation and foreseeable harm to his career, and (3) emotional distress.

4.      that the Court determine and award him his attorneys' fees and any costs associated with Defendants' breach of contract, or otherwise to the fullest extent permitted by law for interest to the full extent permitted by law;

5.      as to RSA 275-E:2, (1) a declaration that Dartmouth violated RSA 275-E:2; (2) injunctive and/or equitable relief as authorized by RSA chapter 275-E, including relief necessary to make Plaintiff whole (including back pay/front pay where applicable); (3) pre- and post-judgment interest as allowed by law; and (4) attorneys' fees and costs; and,

6.      award other and further relief as this Court deems just and appropriate.

<div style="margin-left: 50%;">

Respectfully submitted,
JUSTIN WOOD

By his attorneys,
SHAHEEN & GORDON, P.A.

</div>

Dated: December 17, 2025

<div style="margin-left: 50%;">

*/s/ Olivia F. Bensinger*_____
Olivia F. Bensinger, Esq. (NH Bar #274145)
Shaheen & Gordon, P.A.
107 Storrs Street, P.O. Box 2703
Concord, NH 03302
(603) 225-7262
obensinger@shaheengordon.com

</div>

14

AND

GORDON LAW GROUP, LLP

*/s/ Benjamin Flam*
Philip Gordon, Esq. (*Pro hac vice*)
Benjamin Flam, Esq. (*Pro hac vice*)
Gordon Law Group, LLP
585 Boylston Street
Boston, MA 02116
(617) 536-1800
pgordon@gordonllp.com
bflam@gordonllp.com

## CERTIFICATE OF SERVICE

I hereby certify that this pleading was served upon all parties through the Court's electronic filing system.

Dated: December 17, 2025                    */s/ Benjamin Flam*
                                            Benjamin Flam